T.C. Memo. 2019-38

UNITED STATES TAX COURT

ESTATE OF SCOTT C. RONNING, DECEASED, HARLAN L. PAUL,
PERSONAL REPRESENTATIVE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22469-11.                          Filed April 15, 2019.

Frank G. Podesta, for petitioner.

Lawrence D. Sledz, David Delduco, Christopher D. Bradely, and Courtney
S. Bacon, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge: Scott C. Ronning, and his then-wife, Valerie Ronning,
filed joint income-tax returns for 2005, 2006, 2007, and 2008. In May 2009, Scott
Ronning filed for bankruptcy. In 2010, the Ronnings divorced. In May 2011, the

[*2] bankruptcy case was closed without discharge. On June 30, 2011, the respondent (or the "IRS") issued notices of deficiency to the Ronnings. The respondent determined the following income-tax deficiencies and accuracy-related penalties under section 6662(a).[1]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2005 | $23,635 | -0- |
| 2006 | 279,303 | -0- |
| 2007 | 1,988,382 | $397,676 |
| 2008 | 83,858 | 16,358 |

Scott Ronning timely filed a Tax Court petition under section 6213(a) for a redetermination of the deficiencies and penalties. We have jurisdiction under section 6214(a).[2] Scott Ronning died after he filed the Tax Court petition. The personal representative of his estate, Harlan Paul, was substituted as the petitioner.

---

[1]Unless otherwise indicated, all references to sections are to the Internal Revenue Code of 1986, as amended, and all references to Rules are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

[2]Valerie Ronning did not petition the Court. Therefore, we do not have jurisdiction to redetermine the deficiencies and penalties with respect to her. See Rule 34(a); United States v. Jenkins, 780 F.2d 518 (5th Cir. 1986); Davenport v. Commissioner, 48 T.C. 921 (1967).

**[*3]** Our holdings are as follows:

1. <u>Cost of goods sold for Atlanta Site Consultants, LLC, for 2007</u>. Attached to the return for 2007 was a Schedule C, "Profit or Loss From Business", for Atlanta Site Consultants, LLC. The Schedule C reported cost of goods sold of $7,175,870. The notice of deficiency determined that cost of goods sold was zero. Before trial, the IRS conceded that cost of goods sold was $4,117,386. We hold that cost of goods sold is $4,117,386. Furthermore, there should be no adjustment to the $1,117,489 reported on the Schedule C for business-expense deductions.

2. <u>Net operating loss (NOL)</u>. As a computational result of our resolution of the cost-of-goods-sold issue for 2007, there is (a) no NOL for 2007, (b) no NOL-carryback deduction for 2005 and 2006 related to the carryback of an NOL for 2007, and (c) no NOL-carryforward deduction for 2008 for the carryforward of an NOL for 2007.

3. <u>Gross income for 2008</u>. The 2008 return failed to report $323,566 of gross income.

4. <u>Section 6662(a) penalties for 2007 and 2008</u>. There is a penalty under section 6662(a) equal to 20% of the underpayment for 2007. There is no liability for the penalty under section 6662(a) for 2008.

**[*4]**                               FINDINGS OF FACT

Background

Scott Ronning was a real-estate developer during the years at issue. He operated his business through Atlanta Site Consultants, LLC. He was the sole owner of this LLC, which was a disregarded entity for federal tax purposes.

He also operated his real-estate business through one or more other LLCs that were treated as partnerships for federal tax purposes.[3]

Valerie Ronning worked as a real-estate agent during the years at issue.

---

[3]On the Schedule E, "Supplemental Income and Loss", of the Ronnings' 2007 return, the following entities are named as partnerships in which one of the Ronnings had an interest: Southern Wallboard, LLC; Vintage Home Georgia, LLC; and ABG Holdings I, LLC.

When Scott Ronning declared bankruptcy in May 2009, he stated that he had an ownership interest in the following entities: Atlanta Road Development, LLC; Oaks at Powers Ferry Townhomes, LP; Daves Creek, LLC; Deep Water Holdings, LLC; Sawgrass Landing, LLC; ABG Development, LLC; ABG Holdings I, LLC; Atlanta Site Consultants, LLC; Clairmont Townhomes Atlanta, LLC; Kelly Mill, LLC; Post Pittman, LLC; ABG SCR, LLC; Estates of Oakwood, LLC; Townhomes of Briarwood, LLC; ABG Atlanta, LLC; Atlanta Partners, LLC; Avenues Investment Group, LLC; Regency Atlanta, LLC; The Avenues Development Group, LLC; Alpharetta Medical Partners, LLC, and Capital Partners, LLC. The record is not sufficient to allow us to find that any of these entities was an LLC, treated as a partnership for federal tax purposes, through which Scott Ronning operated his real-estate business.

**[*5]** <u>Returns</u>

The Ronnings' 2007 return, which was filed in 2008, was prepared by Perry P. Gambrell, a certified public accountant (CPA). Gambrell prepared the return based on a document he called a "trial balance". He had received the trial balance from the bookkeeping department that kept track of the finances of Scott Ronning's real-estate business. The bookkeeping department was under severe strain when the 2007 return was filed. The department could not give Gambrell more complete information about Scott Ronning's real-estate business.

The 2007 Schedule C for Atlanta Site Consultants, LLC, reported gross receipts of $6,347,406. It reported that cost of goods sold was $7,175,870, which it calculated as follows:

|   | | |
|---|---|---|
|   | Inventory at beginning of year | -0- |
| + | Purchase costs | -0- |
| + | Cost of labor | $857,148 |
| + | Materials and supplies | 1,395,526 |
| + | Other costs | 4,923,196 |
| − | Inventory at end of year | -0- |
| = | Cost of goods sold | 7,175,870 |

The Schedule C reported a net loss of $1,945,953, calculated as follows:

|   | | |
|---|---|---|
|   | Gross receipts | $6,347,406 |
| − | Cost of goods sold | 7,175,870 |
| − | Total business-expense deductions | 1,117,489 |
| = | Net loss | 1,945,953 |

[*6] The business-expense deductions were broken down into 17 categories.

The Ronnings' Schedule E for 2007 reported that the Ronnings had income and losses from the following purported partnerships:

- Atlanta Site Consultants, LLC. $12,761 income.
- Southern Wallboard, LLC. $46,794 loss.
- Vintage Home Georgia, LLC. $10,903 loss.
- ABG Holdings I, LLC. $0.
- ABG Holdings I, LLC ("rental"). $0.

The total reported Schedule E loss is $44,936, which is the sum of the above amounts. The record does not show how these amounts were derived. A partner usually copies his or her amounts of partnership income and loss from Schedules K-1, "Partner's Share of Income, Deductions, Credits, etc." There are no Schedules K-1 in the record. There are no Forms 1065, "U.S. Return of Partnership Income", in the record either.

The record does not show why the income and loss for Atlanta Site Consultants, LLC, was reported on both Schedule C and Schedule E of the 2007 return. As we have found, Atlanta Site Consultants, LLC, was a disregarded entity. The income and expenses of a disregarded entity are usually reflected on a Schedule C rather than a Schedule E. The record does not show why there are two entries on Schedule E for ABG Holdings I, LLC.

**[\*7]**  In part because of the $1,945,953 net loss reported on the 2007 Schedule C for Atlanta Site Consultants, LLC, the Ronnings reported an NOL for 2007.  When they filed their 2007 return, they simultaneously filed amended 2005 and 2006 returns to report carryback deductions for portions of the NOL from 2007.[4]

When they filed their 2008 return, the Ronnings reported the carryforward deduction for a portion of the NOL from 2007.

To the 2008 return the Ronnings attached a Schedule C for Valerie Ronning's real-estate business.  On Valerie Ronning's Schedule C, they reported the following amounts:

|   | | |
|---|---|---|
|   | Gross receipts | $68,255 |
| − | Business-expense deductions | 187,749 |
| = | Net loss | 119,494 |

Bankruptcy petition; loss of records; marital separation; illness; and divorce

In May 2009, Scott Ronning filed for personal bankruptcy.  Among the alleged debts listed in the bankruptcy petition are 22 debts from which the petitioner would derive his litigation position in the Tax Court.  The petitioner

---

[4]The amended 2005 and 2006 returns differed from the original 2005 and 2006 returns only in that the amended returns reflected deductions for the carrybacks of the NOL from 2007.  It is unnecessary to describe either the original 2005 and 2006 returns or the amended 2005 and 2006 returns.  That is because the notice of deficiency made no adjustments for the 2005 and 2006 years except that it disallowed the NOL-carryback deductions reported on the amended 2005 and 2006 returns.

**[*8]** infers from the information in the bankruptcy petition about these 22 debts that Scott Ronning incurred expenses and that these expenses should give rise to cost-of-goods-sold allowances (or business-expense deductions) for 2007. The amounts of the alleged expenses are calculated in Exhibit 14-P. We describe Exhibit 14-P throughout our opinion.

As related to the petitioner's litigating position, the relevant information about the 22 debts in the bankruptcy petition includes the name of the creditor, the amount of the debt, the description of the debt, and any notation about there being a codebtor. The table below contains this information from the bankruptcy petition and the amount of expense calculated in Exhibit 14-P:

| Name of creditor | Information about debt | Co-debtor | Amt. of debt | Amt. of expense calculated in Ex. 14-P |
|---|---|---|---|---|
| Georgia Dept. of Revenue | "2007 State Income Tax" | No | $55,000 | $55,000 |
| IRS | "2005 Federal Employee Taxes" | No | 44,000 | 44,000 |
| IRS | "2006 Federal Withholding Taxes" | No | 21,000 | 21,000 |
| Bryan Cave | "Legal Services" | No | 75,000 | 75,000 |

**[*9]**

| Name of creditor | Information about debt | Co-debtor | Amt. of debt | Amt. of expense calculated in Ex. 14-P |
|---|---|---|---|---|
| Davis, Pickren & Seydel LLP | "Legal Services" | No | 270,000 | 270,000 |
| Jon Oden, Esq. | "3/4/09 Legal Services" | No | 441 | 441 |
| Stites & Harbison | "Legal Services" | No | 30,000 | 30,000 |
| Weissman, Nowack | "3/3/09 Legal services (ABG Development LLC)" | No | 2,829 | 2,829 |
| U.S. Fire Insurance Co. | "Settlement agreement (judgment in lawsuit)" | No | 230,323 | 230,323 |
| Liberty Mutual | "Personal Guarantee (bond claim, financial assistance)" | No | 630,000 | 630,000 |
| Alpharetta Community Bank | "Personal Guarantee-- Atlanta Road Development, LLC" | No | 5,014,272 | 1,001,582 |
| Bank of North Georgia | "2/3/00 Personal Guarantee--ABG Holdings, I, LLC and Vintage Homes Georgia, LLC" | Yes | 4,150,000 | 307,868 |

**[*10]**

| Name of creditor | Information about debt | Co-debtor | Amt. of debt | Amt. of expense calculated in Ex. 14-P |
|---|---|---|---|---|
| Builders Firstsource-Atlantic | "Personal Guarantee--Vintage Homes Georgia, LLC" | Yes | 350,000 | 25,965 |
| Cecil B. Foundation, Inc. | "Personal Guarantee--Daves Creek, LLC" | Yes | 750,000 | 62,337 |
| Colonial Bank, NA | "Personal Guarantee--Atlanta Road Development, LLC" | Yes | 4,855,832 | 484,966 |
| First Colony Financial Corp. | "Personal Guarantee--Sawgrass Landing, LLC" | Yes | 2,500,000 | 19,325 |
| Integrity Bank | "Personal Guarantee--Oaks at Powers Ferry Townhomes, LP" | Yes | 14,885,000 | 1,234,696 |
| Integrity Bank | "Personal Guarantee--Atlanta Road Development, LLC" | Yes | 5,960 | 595 |
| RBC Bank | "Personal Guarantee--Daves Creek, LLC" | Yes | 7,163,960 | 595,443 |
| Royal Bank of Scotland PLC | "Personal Guarantee--Deep Water Holdings, LLC" | Yes | 15,000,000 | 852,737 |

**[*11]**

| Name of creditor | Information about debt | Co-debtor | Amt. of debt | Amt. of expense calculated in Ex. 14-P |
|---|---|---|---|---|
| The Zeist Foundation, Inc. | "Personal Guarantee--Atlanta Road Development, LLC" | Yes | 2,200,000 | 219,721 |
| Westplan Investors | "Personal Guarantee--Powers Ferry Townhomes, LLC" | Yes | 3,500,000 | 290,908 |

The information in the table above reflects the information reported by Scott Ronning in his bankruptcy petition. The information does not constitute our findings of fact.

For the first 10 of the 22 debts listed in the table above, the cost-of-goods-sold allowance (or business-expense deduction) the petitioner seeks exactly equals the amount of the debt listed in the bankruptcy petition. For the last 12 debts, the petitioner argues that interest accrued on the debt before the filing of the bankruptcy petition and that there should be cost-of-goods-sold allowances (or business-expense deductions) for tax year 2007 for the interest accruals. The calculations of interest accruals are in Exhibit 14-P. More will be said of these interest calculations infra part 1(b).

[*12] At some point, all of Scott Ronning's business records were moved into a storage facility.

In 2009, the storage facility notified Scott Ronning that it would destroy his records because of nonpayment of storage fees.

In 2009, the storage facility destroyed Scott Ronning's records.

Sometime in 2009, Scott and Valerie Ronning separated. It is unclear whether they were separated before or after Scott Ronning filed the bankruptcy petition in May 2009.

In 2010, Scott Ronning became ill and was hospitalized.

In 2010, Scott and Valerie Ronning divorced.

Examination and notices of deficiency

The Ronnings' 2005-2008 tax returns came under examination by the respondent. The examination was conducted by Revenue Agent Andre N. Edmond. Edmond prepared a civil penalty approval form that covered all four years. The form had a heading for "Reason(s) for Assertion of Penalty(s)". Underneath was written: "Revenue agent asserted accuracy related penalty as it is believed that taxpayers were negligent". On the form, Edmond checked a "Yes" box for negligence for the section 6662(a) penalty. There were other boxes on the form that corresponded to other potential causes of underpayments specified in

[*13] section 6662(b).  These other boxes were checked "No".  The civil penalty approval form was signed by Edmond's immediate supervisor on April 15, 2011.

The notices of deficiency, issued June 30, 2011, determined deficiencies for 2005, 2006, 2007, and 2008.  One notice of deficiency was for 2005 through 2007.  The other was for 2008.

For 2007, the only noncomputational adjustment in the notice of deficiency was to reduce to zero the cost of goods sold reported on the Schedule C for Atlanta Site Consultants, LLC.  There were no adjustments to the gross receipts or business-expense deductions reported on that Schedule C.

For 2007, the notice of deficiency made no adjustments to Schedule E.

As a computational result of the disallowance of cost of goods sold for the 2007 Schedule C of Atlanta Site Consultants, LLC, the notice of deficiency determined that the NOL for 2007 was eliminated.  This in turn resulted in the elimination of NOL carrybacks to 2005 and 2006 and NOL carryforward to 2008.  The corresponding deductions for the NOL carrybacks and carryforward were disallowed by the notices of deficiency.  Besides the disallowance of the NOL-carryback deductions for 2005 and 2006, the notice of deficiency made no other adjustments for 2005 and 2006.

[*14] For 2008, the notice of deficiency determined that the Ronnings failed to report gross income of $323,569. The notice of deficiency also determined that the business-expense deductions for Valerie Ronning's Schedule C business were $46,548, not the $187,749 amount reported. These two adjustments were the only noncomputational adjustments made by the notice of deficiency for 2008.

The notices of deficiency determined to impose section 6662(a) penalties for both 2007 and 2008.

For 2007, the notice of deficiency stated that there was an underpayment of tax that was due to three alternative causes: negligence, substantial understatement of income tax, or substantial valuation misstatement.

For 2008, the notice of deficiency also stated that there was an underpayment of tax that was due to three alternative causes: negligence, substantial understatement of income tax, or substantial valuation misstatement. The statement was:

**[\*15]** 20 Percent Penalty--Internal Revenue Code Section 6662(a)

> It has been determined that the underpayment of tax shown on line 7 below is attributable to one or more of the following:
>
> (1) Negligence or disregard of rules or regulations;
> (2) Substantial understatement of income tax;
> (3) Substantial valuation misstatement (overstatement).

> Therefore, an addition to tax is imposed as provided by Section 6662(a) of the Internal Revenue Code.

A page later, the notice of deficiency for 2008 clarified that the cause of the underpayment for 2008 was substantial understatement of income tax. This statement was:

2008--Adjustments Subject to Accuracy-Related Penalty--IRC 6662
ADJUSTMENTS TO WHICH THE ACCURACY RELATED
PENALTY APPLIES:
PENALTY RATES
20% 40%
Sch C1 - Gross Receipts or Sales   X          323,569.00 IRC 6662(d)

The notice of deficiency did not determine a section 6662(a) penalty for 2005 or 2006.

Filing of Tax Court petition; death; and substitution of party

In September 2011, Scott Ronning timely filed the Tax Court petition. His mailing address was in Wisconsin when he filed the petition.

In 2012, Scott Ronning died in a car accident in Florida.

[*16] Harlan L. Paul was appointed by a Florida court as the personal representative of Scott Ronning's probate estate. We substituted Paul for Scott Ronning as the petitioner. See Rule 63(a).

## OPINION

The general rule is that the taxpayer bears the burden of proof. See Rule 142(a)(1). Section 7491(a) provides an exception to this general rule. The petitioner does not argue that this exception is applicable. Nor does the record show that this exception is applicable. Therefore, the petitioner has the burden of proof.

1.    Cost of goods sold for Atlanta Site Consultants, LLC, for 2007

     a.    Exhibit 13-J

The petitioner hired Michael Thompson, a CPA with experience in forensic accounting, to reconstruct the records of Scott Ronning's business. The petitioner issued Tax Court trial subpoenas to banks that he thought had records regarding Scott Ronning's business. The petitioner received bank records in response to the subpoenas. The trial record does not contain a complete copy of the bank records that the petitioner received in response to the subpoenas.

[*17] Thompson assembled a packet of material that was admitted at trial as Exhibit 13-J. Exhibit 13-J contains some, but not all, of the bank records that the petitioner had received in response to his subpoenas.

Before trial, the petitioner engaged in settlement negotiations with the IRS regarding the proper amount of cost of goods sold for 2007. To assist in these negotiations, the petitioner gave the respondent the material in Exhibit 13-J. After reviewing the bank records in Exhibit 13-J, the respondent determined that they proved that various payments had been made in 2007.

Of the various payments that the respondent considered proven to have been made in 2007, the respondent determined for the purpose of settlement negotiations that $962,975 of the payments had been reported as business-expense deductions on the 2007 Schedule C for Atlanta Site Consultants, LLC. Recall that the 2007 Schedule C for Atlanta Site Consultants, LLC, reported $1,117,489 of business-expense deductions. The notice of deficiency made no adjustment to this amount. The respondent's review of the bank records did not result in a change in the respondent's litigating position regarding this amount. Thus, the IRS does not dispute that the correct amount of business-expense deductions is $1,117,489.

Of the various payments that the respondent considered proven to have been made in 2007, the respondent determined that another $4,117,386 of the payments

**[*18]** should be allowed to the Ronnings as a cost-of-goods-sold allowance for 2007. Recall that the 2007 Schedule C for Atlanta Site Consultants, LLC, reported $7,175,870 of cost of goods sold. The notice of deficiency reduced this amount to zero. As a result of its analysis of Exhibit 13-J, the respondent conceded before trial that there should be a cost-of-goods-sold allowance of $4,117,386.

      b.      Exhibit 14-P and its calculation of expenses

The Court admitted Exhibit 14-P, which contains Thompson's computations of expenses that the petitioner argues must be allowed as cost of goods sold (or deducted) for 2007. The computations are based on information about 22 debts reported in Scott Ronning's bankruptcy petition. See supra pp. 8-11.

For each of the first 10 of these 22 debts, Exhibit 14-P calculates a 2007 expense exactly equal to the amount of the debt shown in the bankruptcy petition. For example, the bankruptcy petition refers to a $55,000 debt owed by Scott Ronning to the Georgia Department of Revenue for "2007 State Income Tax". Exhibit 14-P calculates that Scott Ronning incurred a $55,000 expense in 2007, exactly equal to the amount of the debt reported on the bankruptcy petition.

For each of the remaining 12 of the 22 debts, Exhibit 14-P calculates an interest expense that is mathematically computed from the amount of the debt, but

[*19] is not equal to it. Here is an example. One of the debt entries on the bankruptcy petition stated that Scott Ronning owed $5,014,272 to Alpharetta Community Bank for "Personal Guarantee--Atlanta Road Development, LLC". The debt was supposedly owing in May 2009, because that is when Scott Ronning filed his bankruptcy petition. In Exhibit 14-P Thompson estimated that this loan had been initially made on January 1, 2006. He estimated that the loan had an interest rate of 9% during 2006, an interest rate of 8% during 2007, and an interest rate of 6.75% during 2008. Using these interest rates, Thompson computed that the interest on the loan was $351,212 for 2006, $340,285 for 2007, and $310,085 for 2008. Thus, the total interest on this loan incurred for the years 2006-2008 was $1,001,582, according to Exhibit 14-P. On the basis of this calculation, the petitioner seeks cost-of-goods-sold allowances (or business-expense deductions) of $1,001,582 for 2007.

For the other 11 of the 12 debt entries from which he inferred an interest expense, Thompson used a method for calculating interest that was similar to his method for the Alpharetta Community Bank loan. He estimated the date the loan originated. This estimate of the date appears to be based on information in the bankruptcy petition. Some of the loan-origination dates Thompson used were on January 1, 2006. For these particular loans Thompson estimated that interest was

[*20] incurred every day of the three years 2006 through 2008. Some of the loan-origination dates estimated by Thompson were in the middle of the three-year period 2006 through 2008. For these years Thompson estimated that interest was incurred from the estimated loan-origination date until December 31, 2008. He applied the same interest rates for all 12 debts (i.e., he used 9% for interest incurred in 2006, 8% for 2007, and 6.75% for 2008).

For the last 11 debt entries, the bankruptcy petition shows that Scott Ronning had a "co-debtor". For these debts Thompson assumed in his computations that the debt owed by Scott Ronning was half of the amount listed on the bankruptcy petition.

Thompson's calculations in Exhibit 14-P are based almost entirely on the information in the bankruptcy petition. For example, the bank records in Exhibit 13-J do not prove or support any of the calculations in Exhibit 14-P. The sole exception to this statement is that the bank records in Exhibit 13-J contain monthly billing statements by Alpha Bank & Trust regarding one particular loan from that bank.[5] Thompson used these billing statements to create his estimate of interest

---

[5]The statements to do not say who the debtor is. The statements are addressed to:

Clairmont Townhomes Atl LLC

(continued...)

**[*21]** rates (i.e., 9% for 2006, 8% for 2007, and 6.75% for 2008) for the 12 loans that Thompson assumed gave rise to interest accruals. Thompson did not estimate an interest expense for the Alpha Bank & Trust loan itself. Nor does the petitioner claim cost-of-goods-sold allowances (or business-expense deductions) for the interest on the Alpha Bank & Trust loan even though the loan is listed in the bankruptcy petition.[6]

    c.    <u>The petitioner's litigation position: the $6,454,736 of expenses calculated in Exhibit 14-P should be allowed as cost-of-goods-sold allowances (or business-expense deductions) for 2007</u>

The amounts of cost-of-goods-sold allowances (or business-expense deductions) the petitioner seeks for 2007 are listed in the findings of fact where we describe the 22 debts listed in the bankruptcy petition. <u>See</u> <u>supra</u> pp. 8-11. As noted above, the petitioner relies on Exhibit 14-P for the computation of these amounts. The total amount in Exhibit 14-P is $6,454,736.[7]

---

[5](...continued)
Ronald V Morgan
Scott C Ronning

This might suggest that the debtor was one or more of these addressees.

[6]The bankruptcy petition described the loan as "Personal Guarantee-- Clairmont Townhomes Atlanta, LLC".

[7]Although the sum of the amounts in Exhibit 14-P is $6,454,736, the amount
(continued...)

**[*22]** Significantly, the petitioner's litigating position does not rely on Exhibit 13-J. Neither the petitioner's opening brief nor his answering brief assert that the Court should consider Exhibit 13-J in determining the appropriate cost-of-goods-sold allowances (or business-expense deductions) corresponding to the $6,454,736 amount.

Another aspect of the petitioner's litigating position relates to the appropriate year of the cost-of-goods-sold allowances (or business-expense deductions) he seeks for interest expenses. Exhibit 14-P estimated the amounts of interest expenses that Scott Ronning incurred during 2006, 2007, and 2008 based on 12 of the 22 debts. The petitioner contends that these interest expenses give rise to cost-of-goods-sold allowances (or business-expense deductions) for the tax year 2007. The petitioner does not explain why interest incurred during all three years 2006, 2007, and 2008 should affect taxable income for 2007. We need not consider this aspect of the petitioner's litigating position in further detail. As explained later in this opinion, we reject the petitioner's litigating position regarding the interest expenses for other reasons. See infra part 1(f)(ii).

---

[7](...continued)
shown in Exhibit 14-P as the sum of the amounts is $6,454,737, due to rounding or to computational error.

**[\*23]** Another aspect of the petitioner's litigating position is that he does not specify whether any particular expense that makes up the $6,454,736 amount should be classified as a cost-of-goods-sold allowance as opposed to a business-expense deduction. For example, the petitioner's brief explains that "some" of the expenses comprising the $6,454,736 amount "was cost of goods sold."[8] The petitioner also seeks "deductions" for unspecified portions of the $6,454,736 amount.

Another aspect of the petitioner's litigating position is that he concedes that any of the particular expenses comprising the $6,454,736 amount--except for the interest expenses--could have been incurred by a partnership. The petitioner asserts that Scott Ronning was a partner in whatever partnership incurred the expenses.

For the interest expenses, the petitioner makes a different assumption. He contends that Scott Ronning was the guarantor of the loans giving rise to the interest obligations, that the loans in question were defaulted on, and that therefore Scott Ronning was personally liable for the interest that accrued after default.

---

[8]Due to a calculation error, the petitioner's brief refers to the amount as $7,893,300.

**[*24]** Under this assumption, Scott Ronning, not a partnership, incurred the interest expenses.

     d.     <u>The relationship between (a) the $6,454,736 amount referred to by the petitioner in his litigating position and (b) the $4,117,386 amount conceded by the respondent</u>

As explained above, the petitioner takes the position that some of the amounts comprising the $6,454,736 amount are allowable as cost of goods sold (as opposed to business-expense deductions). What may require further explanation is how the $6,454,736 amount the petitioner alleges relates to the $4,117,386 amount the respondent conceded before trial to be a cost-of-goods-sold allowance for 2007. As the IRS explained in its brief, it believes the $4,117,386 amount is payments actually made by Atlanta Site Consultants, LLC, during 2007. By contrast, none of the amounts comprising the $6,454,736 alleged by the petitioner are amounts that were actually paid. Under the petitioner's theory, these amounts were incurred but not paid. Therefore, there appears to be no overlap between the $6,454,736 amount (because it comprises unpaid amounts) and the $4,117,386 amount (because it comprises paid amounts). Thus, were we to find that there should be a cost-of-goods-sold allowance (or a deduction) for any of the amounts comprising the $6,454,736 amount, that would mean that we would not be giving

**[\*25]** a tax benefit that had already been accounted for in the IRS's cost-of-goods-sold concession.

      e.      <u>The relationship between (a) the $6,454,736 amount referred to by the petitioner in his litigating position and (b) the $1,117,489 reported on the 2007 Schedule C for Atlanta Site Consultants, LLC</u>

What is not as clear is the relationship between the $6,454,736 amount alleged by the petitioner and the $1,117,489 of expenses reported on the 2007 Schedule C for Atlanta Site Consultants, LLC. This $1,117,489 reported amount was not challenged by the IRS in the notice of deficiency or at trial. Furthermore, the respondent determined, when it analyzed the bank records in Exhibit 13-J, that most of the $1,117,489 in reported expenses (i.e., $962,975) were traceable to actual payments by Atlanta Site Consultants, LLC.[9] This would distinguish these traceable amounts from the amounts comprising the $6,454,736, which the petitioner alleges are unpaid. This might suggest that there is not much overlap between the $6,454,736 amount and the $1,117,489 of expenses reported on the 2007 Schedule C for Atlanta Site Consultants, LLC. To further defuse the notion that there might be an overlap, the petitioner attempted at trial to prove that none

---

[9]As explained later in this part 1(e), it is unnecessary for us to determine what significance, if any, the Court should accord to the respondent's determination that $962,975 of payments reflected in the bank records were reported on the 2007 Schedule C for Atlanta Site Consultants, LLC.

[*26] of the amounts comprising the $6,454,736 had been reported on the 2007 Schedule C for Atlanta Site Consultants, LLC. To do this, the petitioner called as a witness Gambrell, the CPA who prepared the Ronnings' 2007 return. Gambrell testified that none of the amounts comprising the $6,454,736 had been reported as business-expense deductions on the 2007 Schedule C for Atlanta Site Consultants, LLC. If Gambrell is to be believed, then there is no overlap between the $6,454,736 amount argued by the petitioner on brief and the $1,117,489 of expenses reported as deductions on the Schedule C. And were we to find that there should be cost-of-goods-sold allowances (or business-expense deductions) for the amounts in Exhibit 14-P, that would not mean that we would be giving a tax benefit that had already been accounted for on the Schedule C. We need not resolve whether any of the $6,454,736 was reported as a business-expense deduction on the Schedule C. This is because, as we explain infra part 1(f), even if no portion of the $6,454,736 amount was reported on the Schedule C, no cost-of-goods-sold allowances (or business-expense deductions) should be made for any of the amounts comprising the $6,454,736 estimate.

**[*27]** f.    Correct tax treatment of the $6,454,736 of alleged expenses

For analytical purposes, we divide the $6,454,736 of expenses calculated in Exhibit 14-P into two groups. The first group corresponds to expenses derived from the first 10 of the 22 debts listed in the bankruptcy petition that Thompson relied on in Exhibit 14-P. The second group corresponds to interest expenses derived from the last 12 of the 22 debts Thompson relied on in Exhibit 14-P.

> i.    Expenses related to the first 10 of the 22 debts listed in the bankruptcy petition

As we explained, the petitioner admits that the expenses based on the first 10 of the 22 debts could have been incurred by a partnership.[10] The petitioner

---

[10]The petitioner describes the entities that supposedly incurred the expenses as follows: "[T]hese companies were owned by either Petitioner or ASC [i.e., Atlanta Site Consultants, LLC], and thus should flow to Petitioner via Schedule C or K-1 either directly to Petitioner or indirectly via ASC". Subsumed within this description are several alternative theories of how the expenses calculated in Exhibit 14-P affect Scott Ronning's 2007 income. Here are the alternative theories: (1) the expenses were incurred by a disregarded entity owned by Scott Ronning, (2) the expenses were incurred by a disregarded entity owned by Atlanta Site Consultants, LLC (which as we have found is itself a disregarded entity), (3) the expenses were incurred by a partnership (or an LLC treated as a partnership) partly owned by Scott Ronning, and (4) the expenses were incurred by a partnership (or an LLC treated as a partnership) partly owned by Atlanta Site Consultants, LLC. The petitioner has the burden of proof. See supra p. 16. The record does not show that any entity that could have incurred the Exhibit 14-P expenses was a disregarded entity instead of a partnership. It is therefore appropriate to assume that the entity that incurred the expense is a partnership. This assumption is also appropriate given the petitioner's position on brief, which

(continued...)

**[\*28]** does not take a position on whether these expenses should be computed through a cost-of-good-sold allowance or should be deducted from gross income. We will consider the propriety of both potential tax treatments. We start with the calculation of a cost-of-goods-sold allowance.

### (1)    Cost of goods sold

For taxpayers who use an inventory method of accounting, a cost-of-goods-sold allowance is calculated for each year. Cost of goods sold is reflected in gross income as a reduction. Sec. 1.61-3, Income Tax Regs. The formula for cost of goods sold is essentially as follows: cost of beginning inventory + costs of purchases and production – cost of ending inventory. Huffman v. Commissioner, 126 T.C. 322, 324 (2006), aff'd, 518 F.3d 357 (6th Cir. 2008). Under certain circumstances, the costs in the formula may be calculated not from actual costs but from values of the relevant assets. W.C. & A.N. Miller Dev. Co. v. Commissioner, 81 T.C. 619, 633-634 (1983).

---

[10](...continued)
admits this possibility. Thus, we do not analyze theories (1) and (2), theories in which Scott Ronning or Atlanta Site Consultants, LLC, owned a disregarded entity. We are left with theories (3) and (4), theories in which Scott Ronning or Atlanta Site Consultants, LLC, owned an interest in a partnership. For the sake of simplicity, we assume that the petitioner's operative theory is theory (3), i.e., that Scott Ronning owned an interest in a partnership that incurred the expense.

[*29] The petitioner concedes that the expenses calculated in Exhibit 14-P could have been incurred by a partnership or partnerships. Thus, calculating the cost-of-goods-sold allowance requires us to determine the partnership's beginning inventory for 2007, the ending inventory for 2007, and the cost of purchases and production for 2007.

But we do not know which partnership or partnerships incurred any particular expense calculated in Exhibit 14-P corresponding to the first 10 of the 22 debts. It follows that we do not know the relevant partnership's beginning inventory for 2007, ending inventory for 2007, and cost of purchases and production for 2007. Thus, we cannot calculate cost of goods sold using the formula stated above. It follows that computationally we cannot use the formula to determine that there is a cost-of-goods-sold allowance attributable to the expenses calculated in Exhibit 14-P corresponding to the first 10 of the 22 debts.

Besides the cost-of-goods-sold formula, another inventory method of accounting is the specific identification method. W.C. & A.N. Miller Dev. Co. v. Commissioner, 81 T.C. at 631-634. Under the specific identification method of accounting, the taxpayer matches an item of inventory that has been sold during the year with the cost of acquiring or producing that particular item of inventory. Fox Chevrolet Inc. (Md.) v. Commissioner, 76 T.C. 708, 722 (1981) ("When

[*30] practical, the specific identification method can be used whereby sales proceeds are matched with the actual cost (or other valuation) of the specific item sold."). The cost of goods sold for that particular sale is the cost of acquiring or producing that particular item of inventory. As with the formula for cost of goods sold, under certain circumstances the value of an asset can be used instead of its actual cost. Id.; W.C. & A.N. Miller Dev. Co v. Commissioner, 81 T.C. at 633 ("[A] departure from the actual cost of the particular items sold takes place."). The specific identification method requires the taxpayer to have a record of the cost of each particular product (or its value under certain instances). Here, the taxpayer is a partnership, the identity of which we are unaware. It follows that we do not have the records necessary to match the expenses in Exhibit 14-P with any particular item of inventory sold by the partnership. Computationally, we cannot use the specific identification method to determine that there is a cost-of-goods allowance attributable to these expenses either.

Moreover, it appears that the partnership that incurred any particular expense in Exhibit 14-P would not be the type of taxpayer that is permitted to use an inventory method of accounting. Scott Ronning, and presumably the partnership or partnerships that incurred the expenses in Exhibit 14-P, was in the business of real-estate development. The income from a business of selling land

[*31] and the improvements to land cannot be computed under an inventory method of accounting. Homes by Ayres v. Commissioner, 795 F.2d 832 (9th Cir. 1986), aff'g T.C. Memo. 1984-475; W.C. & A.N. Miller Dev. Co v. Commissioner, 81 T.C. at 629; Atl. Coast Realty Co. v. Commissioner, 11 B.T.A. 416 (1928); sec. 1.471-1, Income Tax Regs. (inventories must be used by taxpayer who produces, buys, or sells merchandise). For such businesses, the appropriate method of accounting is the "capitalization" method whereby the gain or loss on the sale of an asset is generally computed by subtracting the actual cost of the asset from its sale price. W.C. & A.N. Miller Dev. Co v. Commissioner, 81 T.C. at 631-632; see Boris I. Bittker & Lawrence Lokken, 4 Federal Taxation of Income, Estates and Gifts, para. 105.8.1, at 105-129 (2d ed. 1992) ("[I]nventory accounting may not be used by a dealer in or developer of real property, but the costs of each item sold are instead subtracted in computing gross income from the sale."). There is a difference between (1) the capitalization method of accounting and (2) the specific identification method of inventory accounting. Under the capitalization method of accounting, actual cost must be used. W.C. & A.N. Miller Dev. Co v. Commissioner, 81 T.C. at 632-633. Under the specific identification method of inventory accounting, value can be used instead of actual cost under certain circumstances. Id. Other than this difference, the two methods

[*32] reach similar results.  Id. at 631 ("There is, as acknowledged by respondent, a method of inventory accounting known as the specific identity method which is virtually identical in operation to capitalization.  See R. Hoffman & H. Gunders, Inventories-Control, Costing and Effect Upon Income and Taxes 119-120 (1970 ed.); W. Meigs, C. Johnson & R. Meigs, Accounting:  The Basis for Business Decisions 374-375 (4th ed. 1977).").

Under the capitalization method, none of the expenses calculated in Exhibit 14-P can be recovered in the computation of the 2007 income of the partnership that incurred the expense.  This is because we do not have the records to link any particular expense calculated in Exhibit 14-P with any asset that was sold during 2007.

In summary, the record in this case precludes us from concluding that the expenses calculated in Exhibit 14-P affect the income of whatever partnership or partnerships incurred the expenses.

Now let us suppose, to the contrary, that the expenses calculated in Exhibit 14-P did affect the income of the partnership or partnerships that incurred the expenses.  Even then we would need to consider the effect on Scott Ronning's income.  A partnership is not subject to federal income tax.  Sec. 701.  Rather, the income, losses, and deductions of a partnership are passed through to its partners

[*33] and are based on each partner's distributive share. Sec. 702(a). A partner's distributive share of the partnership's income, losses, and deductions is determined under rules set forth in section 704. We do not know facts necessary to determine Scott Ronning's relevant distributive share for the partnership or partnerships that incurred the expenses calculated in Exhibit 14-P. We do not know which partnership or partnerships incurred the expenses, and the record does not reveal Scott Ronning's distributive share for any partnership whatsoever.

Another problem with calculating the effect on Scott Ronning's income is the outside-basis limitation of section 704(d). That provision states: "A partner's distributive share of partnership loss (including capital loss) shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership". Even if we could determine Scott Ronning's relevant distributive share for a particular partnership, we do not know his outside basis in the partnership. See O'Neill v. Commissioner, 271 F.2d 44, 50 (9th Cir. 1959) ("Proof of basis is a specific fact which the taxpayer has the burden of proving."), aff'g T.C. Memo. 1957-193.

(2)     Deductions

We now consider the effect on Scott Ronning's taxable income if one of the first group of expenses should be allowed as a deduction for 2007. Such a

[*34] deduction would initially be computed in the taxable income of the partnership. See sec. 703(a). To determine the effect of the deduction on Scott Ronning's taxable income, we would need to know Scott Ronning's distributive share of the deduction. See sec. 702(a)(7). We would also need to know his outside basis in the partnership. See sec. 704(d). Again, the petitioner has proven none of these things.

> ii. Expenses related to the last 12 of the 22 debts listed in the bankruptcy petition

The second group of the $6,454,736 in alleged expenses is interest expenses. The petitioner asserts that the debts that allegedly generated the interest expenses were defaulted on and that Scott Ronning became obligated to pay the debts (and interest on the debts) through a guaranty. The petitioner does not take a position on whether these expenses affect the computation of a cost-of-goods-sold allowance or should be deducted from gross income. We consider both potential tax treatments.

> (1) Cost of goods sold

We start with the effect of the interest expenses on the calculation of a cost-of-goods-sold allowance. To the extent an inventory method of accounting is even applicable, we do not know beginning inventory for 2007, ending inventory for

[*35] 2007, or cost of purchases and production for 2007; and we cannot match a particular interest expense to a particular item of inventory or asset. Therefore we conclude that no cost-of-goods-sold allowance should be made for the interest expenses calculated in Exhibit 14-P.

### (2)  Deductions

The petitioner's theory is that the year for which the interest deductions should be allowed is "the December 31, 2007 tax year", meaning 2007. The taxpayer's method of accounting determines for what year the taxpayer is entitled to a deduction. Sec. 461(a) ("The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income."). One method of accounting is the cash method. Sec. 1.446-1(c)(1)(i), Income Tax Regs. Under the cash method, the taxpayer claims deductions for the year in which the amount representing the deduction is paid. Sec. 1.461-1(a)(1), Income Tax Regs. Here the amount representing the deduction is an interest charge. A cash-method taxpayer cannot deduct interest until the interest is paid. See Ronald Moran Cadillac, Inc. v. United States, 385 F.3d 1230, 1235 (9th Cir. 2004) ("Under the cash accounting method, the taxpayer may deduct interest only when it is paid." (citing section 1.461-1(a)(1), Income Tax Regs.)). Another method of accounting

**[\*36]** is the accrual method. Sec. 1.446-1(c)(1)(ii), Income Tax Regs. Under the accrual method, the taxpayer claims a deduction for the year in which the liability is incurred. Sec. 1.461-1(a)(2), Income Tax Regs. Here the liability in question is an interest charge. An accrual-method taxpayer can deduct interest which has been accrued even though unpaid. Cohen v. Commissioner, 21 T.C. 855 (1954).

Scott Ronning used the cash method of accounting for 2007. Or at least, the petitioner has not proven otherwise.[11] The interest accruals hypothesized by Thompson in Exhibit 14-P were never paid. Therefore, they cannot provide a ground for a deduction for a taxpayer using the cash method. See, e.g., DeVoe v. Commissioner, T.C. Memo. 1986-477 (a cash-basis taxpayer cannot deduct unpaid interest), aff'd, 860 F.2d 1088 (9th Cir. 1988).

In our view, the possibility that Scott Ronning was a cash-method taxpayer is sufficient grounds for denying the interest deductions.

In addition, we hold that even if Scott Ronning was an accrual-method taxpayer, there is insufficient proof that he is entitled to an interest expense deduction. An interest expense deduction is justified, if at all, under section

---

[11]Although a taxpayer who derives income from the production, purchase, or sale of merchandise must use the accrual method of accounting for those activities, sec. 1.446-1(a)(4)(i), (c)(2)(i), Income Tax Regs., the preponderance of the evidence does not show that Scott Ronning engaged in this type of activity.

**[\*37]** 163(a), which provides: "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." The petitioner's theory is that the 12 debts listed in the bankruptcy petition were initially owed by various entities with Scott Ronning as the guarantor, that the debts were defaulted on by the primary obligors, and that Scott Ronning became liable for the debts (and the interest on the debts) by the beginning of 2007. Thus, according to the petitioner's theory, Scott Ronning was entitled to deductions for interest accrued during 2007.

It appears to be true, as a matter of legal theory, that a guarantor of a debt may deduct interest once the primary obligor has defaulted. See, e.g., Gregersen v. Commissioner, T.C. Memo. 2000-325, slip op. at 4-6; Tolzman v. Commissioner, T.C. Memo. 1981-689, 43 T.C.M. (CCH) 1, 7 (1981). Before default occurs, however, the guarantor may not deduct interest. Rushing v. Commissioner, 58 T.C. 996 (1972). This is so because a taxpayer may deduct interest only on the taxpayer's own debts. Id. at 1000. Before there is a default, the debt is that of the primary obligor, not the guarantor. Id.

Thus, one factual condition that must be true is that the 12 debts listed in the bankruptcy petition must have been defaulted on by the end of 2007. There is credible evidence in the record that as a general matter Scott Ronning's real-estate business was doing badly during 2007. However, this is not the same thing as

[*38] proof that any of the particular 12 debts was defaulted on by the end of 2007. There is very little evidence in the record about these 12 debts. The primary evidence about the debts is that Scott Ronning claimed on the bankruptcy petition, filed in 2009, that he owed the debts through a "PERSONAL GUARANTEE". This is not the same thing as proof that by the end of 2007 the primary obligor on the debts had defaulted and that Scott Ronning had become liable for the debts as their guarantor.

The lack of proof of the date of default is therefore another reason no interest deduction is allowable for the interest on the 12 debts.

g.      Conclusions and some other considerations

Given our analysis set forth supra part 1(f), we conclude that the cost-of-goods-sold allowance is no greater than the $4,117,386 amount conceded by the respondent. We also conclude that no business-expense deduction should be allowed beyond the $1,117,489 reported on the Schedule C for Atlanta Site Consultants, LLC. In making these conclusions, we have considered other factors that we have not yet discussed. We discuss these factors below.

i.      The principle that a taxpayer can reconstruct income

The petitioner argues that a taxpayer is entitled to reconstruct income when the taxpayer's records are destroyed through no fault of his own. He cites for this

[*39] proposition Bell v. Commissioner, T.C. Memo. 2011-296, 102 T.C.M. (CCH) 609, 611 (2011), in which we stated: "When a taxpayer's records are lost or destroyed through circumstances beyond his control, the taxpayer is entitled to substantiate deductions by reconstructing expenditures through credible evidence." The petitioner contends that Scott Ronning's illness resulted in the destruction of the business records. Therefore, the petitioner contends that they were destroyed through circumstances beyond Scott Ronning's control.

In our view, the evidence shows that the records were lost before Scott Ronning's illness. Therefore we disagree with the petitioner's factual proposition that the records were destroyed for reasons outside Scott Ronning's control. Anyway, we have considered all the reconstructed records that the petitioner introduced at trial. In our view, these reconstructed records, fully considered, do not establish the petitioner's litigating position.

ii. The possibility that the interest expenses were incurred before the loans were defaulted on rather than after

The second group of expenses, as explained above, consists of interest expenses supposedly incurred by Scott Ronning after the original obligor on a loan defaulted on the loan, a default that supposedly triggered Scott Ronning's liability as the guarantor. The evidence does not actually show which particular loans were

**[*40]** defaulted on or the dates of default. This might suggest that there is a

possibility that the original obligor did not default and that the interest was

incurred by the original obligor, not by Scott Ronning as the guarantor of the loan.

In such a situation, Scott Ronning would get cost-of-goods-sold allowances (or

business-expense deductions) for the accrued interest only if the obligor of the

loan was a partnership in which Scott Ronning is a partner.[12] Even in this

situation, Scott Ronning would not be entitled to a cost-of-goods-sold allowance

(or deduction) for the reasons given supra part 1(f)(i)(1), i.e., lack of proof of

distributive share and outside basis.

       iii.    The identity of the partnership or partnerships that may have incurred the expenses calculated in Exhibit 14-P

We discussed supra part 1(f)(i) the expenses calculated in Exhibit 14-P as

having been incurred by an unidentified partnership or partnerships. We did not

consider the possibility that the expenses were incurred by one of the four

particular entities listed as partnerships on the Ronnings' Schedule E for 2007.

Nor did we consider the possibility that the expenses were incurred by one of the

---

[12]Although the cost-of-goods-sold allowances (or business-expense deductions) would also be available if the obligor was a disregarded entity wholly owned by Scott Ronning, the petitioner has not proven that any of the loans were made to disregarded entities wholly owned by Scott Ronning.

[*41] 21 particular partnerships that were listed by Scott Ronning in his bankruptcy petition as entities in which he had ownership interests.

Although we found that Scott Ronning conducted his real-estate-development business through one or more partnerships, we could not identify which entity or entities these were. The mere fact that the four entities were reported on the 2007 Schedule E or that the 21 entities were listed on the bankruptcy petition does not mean the entities existed. There are several reasons we say this. First, the return preparation for 2007 was shoddy. The return preparer--Gambrell--filled out the return using a document called a "trial balance". The trial balance itself is not in the record. Gambrell's testimonial description of the trial balance indicates that the trial balance was inadequate and incomplete as a report of Scott Ronning's income. Second, we are not convinced that the entities, even if they existed in form, had any substance or conducted any business activity. The petitioner admits on brief that the corporate structure is uncertain. He says that "the revenues and expenses of the other companies" were "run through ASC". Third, the petitioner does not propose in his findings of fact that any particular entity existed or that Scott Ronning had an ownership interest in any particular entity. The only exception is Atlanta Site Consultants, LLC. The petitioner asserted that this entity existed, that it was owned by Scott Ronning, and that it

**[\*42]** was a disregarded entity for federal tax purposes. The respondent did not object to these characterizations.

In any event, even if we held or assumed that the expenses calculated in Exhibit 14-P were incurred by any entity named in the 2007 Schedule E or the bankruptcy petition, this would not change our conclusion. The record contains no evidence of any such entity's beginning inventory, ending inventory, or purchase or acquisition amounts. Nor does the record contain evidence of Scott Ronning's distributive share or outside basis.

2.    NOL

A taxpayer's NOL for a tax year is the excess of the taxpayer's deductions over gross income. Sec. 172(c). Unless an exception applies, the NOL for a tax year is carried back to the prior two tax years and is a deduction for each of those two years. Sec. 172(b)(1)(A)(i). Any remaining NOL is carried forward to years after the year of the NOL and is a deduction for each of those later years. Sec. 172(b)(1)(A)(ii).

When the Ronnings reported their NOL on their 2007 return, their computation of the NOL included the $7,175,870 cost of goods sold reported on the 2007 Schedule C for Atlanta Site Consultants, LLC. In part 1 we held that the cost of goods sold is instead $4,117,386. The computational results of this

[*43] holding are as follows: (1) there is no NOL for 2007, (2) there is no NOL carryback to 2005 and 2006, and (3) there is no NOL carryforward to 2008. The determinations in the notices of deficiency disallowing the NOL-carryback deductions for 2005 and 2006 and disallowing the NOL-carryforward deduction for 2008 are therefore sustained.

3.     Gross income for 2008

The notice of deficiency determined that the Ronnings did not report $323,569 of gross income for 2008. Scott Ronning's Tax Court petition stated that this determination was erroneous. In its opening brief, the respondent conceded that the amount of unreported gross income is $323,566. This is three dollars less than the corresponding amount determined in the notice of deficiency. In the petitioner's answering brief, he agreed with that amount. We hold that the amount of unreported gross income for 2008 is $323,566.

4.     Business-expense deductions for 2008 for Valerie Ronning's business

Valerie Ronning was a real-estate agent during 2008. Attached to the Ronnings' 2008 return was a Schedule C for her business. The Schedule C reported business-expense deductions of $187,749. The notice of deficiency determined that the correct amount was $46,548. Scott Ronning's Tax Court petition stated that this determination was in error. In its opening brief, the

[*44] respondent contended that the petitioner did not substantiate any deductible expenses beyond this amount.  In his answering brief, the petitioner agreed.  We hold that the correct amount of business-expense deductions is $46,548.

5.    Penalties

Section 6662(a) imposes a 20% penalty on the portion of an underpayment of tax that is attributable to any of the various causes set forth in section 6662(b).  These causes include negligence, substantial understatement of income tax, and substantial valuation misstatement.  No section 6662(a) penalty is imposed on the portion of an underpayment for which there is reasonable cause and good faith.  Sec. 6664(c)(1).  In general, the section 6662(a) penalty can be imposed only if the initial determination to assess the penalty is personally approved by the immediate supervisor of the individual making the determination.  Sec. 6751(b)(1); see Graev v. Commissioner, 149 T.C. 485, 492-493 (2017), supplementing and overruling in part 147 T.C. 460 (2016); cf., e.g., Walquist v. Commissioner, 152 T.C.___, ___ (slip op. at 14-21) (Feb. 25, 2019) (penalties determined under section 6662(a) and (b)(2) by an IRS computer program without human review are "automatically calculated through electronic means" within the meaning of section 6751(b)(2)(B) and thus exempt from the written supervisory approval requirement under section 6751(b)(1)).

**[\*45]** a.  2007

For tax year 2007, the notice of deficiency determined an underpayment due to three alternative causes:  negligence, substantial understatement of income tax, or substantial valuation misstatement.  The preponderance of the evidence shows that the section 6662(a) penalty was supervisor-approved for only one of these causes:  negligence.  Thus, we need consider only whether the underpayment of tax for 2007 was attributable to negligence.

The petitioner does not contest that if there is an underpayment for 2007, such underpayment is due to negligence.  Nor does he argue that there is reasonable cause for any portion of the underpayment for 2007.  We therefore sustain the respondent's determination to impose the section 6662(a) penalty for 2007.  The amount of the underpayment, and therefore the amount of the penalty, will be determined under Rule 155.

b.  2008

For tax year 2008, the notice of deficiency contained the boilerplate statement that there is an underpayment due to three alternative causes: negligence, substantial understatement of income tax, or substantial valuation misstatement.  See McGuire v. Commissioner, 149 T.C. 254, 262-263 (2017); Ocampo v. Commissioner, T.C. Memo. 2015-150, at \*52.  The notice of

[*46] deficiency then clarified that the underpayment was determined to be due to a substantial understatement of income tax. Because the notice of deficiency determined that the underpayment for 2008 was due to one cause--a substantial understatement of income tax--the question to be considered is whether imposition of the section 6662(a) penalty for a substantial understatement had been supervisor-approved. See Palmolive Bldg. Inv'rs, LLC v. Commissioner, 152 T.C. ___, ___ (slip op. at 19) (Feb. 28, 2019).

The preponderance of the evidence shows that the section 6662(a) penalty had been supervisor-approved only for negligence. It had not been supervisor-approved for a substantial understatement. Therefore, section 6751(b) bars the respondent from imposing the section 6662(a) penalty for 2008. The amount of the liability for the section 6662(a) penalty for 2008 is zero.

To reflect the foregoing,

Decision will be entered

under Rule 155.