KAHN, J.
 

 In a personal injury case, the jury awarded damages to a commercial crabber whose boat collided with an unmarked dredge pipeline off Horseshoe Beach, Florida. Appellant, a dredging company, raises three points: the admission of prior accident evidence; the trial court’s decision to instruct the jury on the Pennsylvania Rule; and the sufficiency of the evidence to support the jury’s verdict on loss of future earning capacity, future medical expenses, and noneconomic damages. We affirm the verdict on liability and reverse in part as to damages.
 

 BACKGROUND
 

 Early on March 14, 2006, appellee, Timothy Corbin, and his daughter, Elizabeth Right, launched appellee’s boat from the county park at Horseshoe Beach. Corbin pulled traps in the Gulf of Mexico for a few hours before his boat entered the beach’s main channel between 11:00 a.m. and noon. Navigating the channel, appellee saw a large pipeline submerged two to eight inches below the surface of the water near marker 16. Appellee turned to Elizabeth, yelling for her to “hang on.” When the boat struck the pipe, Elizabeth hugged a pole near the transom as her father fell upon the wooden picking table behind the console. After the collision, Elizabeth saw that a black pipe lying crosswise in the channel between markers 16 and 17 had lodged between the outboard motor and the transom; she pushed the pipe back down into the water.
 

 On the same day, David Right (Right), a grade-school friend of Corbin and himself a commercial crabber, was working the same area. Right shoved off from the park approximately the same time as ap-pellee, but headed offshore to pull traps in deeper waters. According to Right, around 11:00 a.m., his boat collided with a pipeline in the main channel next to marker 16. Before proceeding back to the park, Right radioed appellee to warn him about the pipeline. Appellee responded that he had already hit the pipe and was returning to shore.
 

 Also on March 14, 2006, appellant, Sub-aqueous Services, Inc. (Subaqueous), was at work dredging canals in and around Horseshoe Beach. On that day, Keith Johnson was charged with swapping out a dredge, “Kenner,” for another called “Y2K.” The tug “Contender” brought the “Kenner” from the county dock to a nearby location, where cranes extracted it from the water and returned the “Y2K” in its place. To facilitate the transfer, Johnson disconnected the dredge pipe from the “Kenner” and tied it to a pylon outside the main channel. He reattached the pipe to the “Y2K” at approximately 12:00 p.m.
 

 Corbin brought this action alleging serious back injury. After discovery, appellant moved in limine to exclude evidence of prior accidents involving other boats and the same pipeline. The Circuit Court limited the admissibility of prior similar accidents evidence to the testimony of Right, who had said his boat collided with an unmarked pipeline submerged eight inches beneath the water and laid up between markers 16 and 18.
 

 At trial, medical evidence confirmed ap-pellee suffered from chronic pain, which prevented him from returning to his cal’eer as a crabber. Pain and discomfort attended or restricted various aspects of appellee’s daily life, from normal sleep at night to playing with his grandchildren. Dr. George Feussner, appellee’s treating neurologist, believed initially that Corbin’s future medical care could cost as much as
 
 *1264
 
 $3,000 to $5,000 per year. After prescribing appellee various forms of treatment with little success, however, Dr. Feussner could recommend only that Corbin remain on a regular regimen of pain killers. Epidural steroid injections, IDD therapy, and even surgery, Dr. Feussner said, might be required depending on Corbin’s future physical status. Feussner did not provide a cost figure for these modalities, except an estimate for one-time surgery, $30,000.
 

 John Roberts, qualified as an expert in the area of vocational and rehabilitation evaluations, also testified on appellee’s behalf. Roberts calculated Corbin’s earning capacity as a “commercial fisherman,” based on wage reports from Tallahassee-based employers and records from the U.S. Department of Labor, at about $12.36 per hour, or $25,790 annually. Roberts called this estimate conservative, in part because commercial fishing is a cash-based business in which tax deductions are prevalent. Roberts determined appellee was suited to perform only sedentary and light duty work after the accident, and could expect to earn between $7.00 and $9.00 per hour (or $15,080 and $18,720 yearly) in one of the occupational groups in which appel-lee would be able to function. Considering the job market in the surrounding area, however, Roberts doubted whether Corbin would find employment nearby.
 

 Appellee’s expert economist, Joseph Perry, also offered testimony on loss of future earning capacity. Relying on Roberts’ vocational evaluation, Corbin’s tax returns between 2001 and 2006, and a life expectancy table, Perry calculated future loss of earning capacity by subtracting projected post-injury earnings from projected pre-injury earnings. Perry also built into the calculation the assumption that pre- and post-injury earnings would increase no faster than the average rate of earnings in the U.S. economy over the relevant time period. Using this approach, Perry computed the actual monetary value of appellee’s earning capacity loss at $303,896, a little over $60,000 of which accounted for past losses. Reduced to present monetary value, Perry placed the figure at $202,172.
 

 At the charge conference, Subaqueous proposed that Corbin’s failure to observe various maritime precautions justified an instruction on the Pennsylvania Rule. This rule of admiralty law provides that the operator of a vessel who fails to observe a maritime safety regulation has the burden to prove that the violation could not have been a cause of the accident.
 
 See The Pennsylvania,
 
 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873) (holding “burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been”). Appellee, in response, suggested the Pennsylvania Rule instruction be given reciprocally, in light of appellant’s alleged violation of one or more of the Inland Navigational Rules (Rules of the Road). 33 U.S.C. §§ 2001-38 (2009). Ultimately, the court resolved to inform the jury of the requirements of Rules of the Road 2, 5, 6, and 7,
 
 *
 
 and concluded the instruction as follows:
 

 
 *1265
 
 If you find that
 
 either the plaintiff or the defendant
 
 violated one of these rules, it is that party’s burden to show by a greater weight of the evidence that the violation of the rule could not have been a legal cause of the damage complained of.
 

 (emphasis added).
 

 The jury returned a verdict in favor of appellee, awarding total damages in the amount of $1,802,302. This figure included $84,600 for future medical expenses, $303,900 for future lost earning capacity, and $1,300,000 for future pain and suffering.
 

 Appellant filed a motion for new trial, contending the court impermissibly allowed Eight to testify concerning his accident; the court wrongfully charged the jury on the Pennsylvania Rule; and the damage awards, except for past medical expenses, were against the manifest weight of the evidence. Subject to agreed-upon modifications in damages for past lost earnings (reduced to $28,000) and loss of future earning capacity (reduced to $236,900), the court denied the motion for new trial.
 

 ANALYSIS
 

 A. Prior Similar Accidents Evidence
 

 We review a trial court’s admission of prior similar accidents evidence for abuse of discretion.
 
 Stephenson v. Cobb,
 
 763 So.2d 1195, 1196 (Fla. 4th DCA 2000). Subaqueous first challenges the admission of Eight’s testimony of another accident. On appeal, appellant asserts it did not deny the existence of the dangerous condition to which Eight’s testimony pertained, i.e., an unmarked, free-floating, submerged dredge pipe lying across the main channel. Therefore, appellant argues, the court abused its discretion in admitting evidence of Eight’s prior accident, because this testimony was not relevant to prove a material fact in dispute. Appellant’s actual litigation strategy, however, sailed on a different tack.
 

 Evidence of a prior similar accident is admissible to show the existence of a dangerous condition.
 
 See Chambers v. Loftin,
 
 67 So.2d 220, 222 (Fla.1953). The admissibility of such evidence is well-recognized where the defendant denies knowledge or the existence of the condition.
 
 See id.
 
 Appellant stated in its motion in limine that the issue in the case was not “a defect in the pipeline, but rather, negligence in the placement and markings of the pipeline.” At trial, Johnson disagreed with appellee’s notion that the pipeline was just under the surface of the water and floating free from the dredge — some of the very conditions that would make it dangerous. Instead, Johnson believed the pipe was tethered to a pylon when the dredges were switched. Johnson’s testimony, read in conjunction with appellant’s motion in li-mine, makes it difficult not to perceive as part of the decking of appellant’s litigation platform the outright denial of a dangerous condition. Eight’s testimony as to his allegedly similar accident was therefore materially relevant to whether Subaqueous was correct in its assertion Corbin “could [not] have hit the pipeline at the location and under the conditions ... existing at the time [he] claims the incident occurred.”
 

 Appellant next contends that Eight’s testimony should have been ex-
 
 *1266
 
 eluded because the significant aspects of the Eight accident differed greatly from Corbin’s. Evidence of “prior similar accidents at or near the same place are admissible if they are not too remote in time.”
 
 Loftin,
 
 67 So.2d at 222. Here, a raft of similarities between Eight’s and Corbin’s accidents emerges as counterweight to the differences. Seemingly within minutes of each other, the vessels of the two commercial crabbers collided with a black, unmarked pipeline submerged less than a foot below the surface of the water near channel marker 16. That the pipeline may have been laid up in a slightly different position from one accident to another, as appellant now asserts, does not sink the admissibility of Eight’s testimony.
 
 See Lawrence v. Fla. East Coast Ry. Co.,
 
 346 So.2d 1012, 1015 (Fla.1977) (holding it is not necessary for similar accidents to occur at an identical place and time). Instead, the substantial parallels between the accidents — in time, general vicinity, and circumstances — -lend the probative value upon which the admissibility of similar accidents evidence depends. Eight’s facts are not beyond the arc of visibility established by Corbin’s account. Accordingly, we find the court did not abuse its discretion in admitting evidence of Eight’s prior similar accident.
 

 B. The Pennsylvania Rule
 

 We review a trial court’s decision to give or withhold a jury instruction for abuse of discretion.
 
 Barbour v. Brinker Fla., Inc.,
 
 801 So.2d 953, 959 (Fla. 5th DCA 2001). Over appellant’s objection, the court allowed the jury to consider the Pennsylvania Rule instruction as to each party. The Pennsylvania Rule applies where three elements exist: (1) proof by a preponderance of the evidence of a violation of a statute or regulation imposing a mandatory duty; (2) the statute or regulation involves marine safety or navigation; and (3) the injury suffered is of a nature the statute or regulation was intended to prevent.
 
 Union Pac. R.R. Co. v. Kirby Inland, Marine, Inc. of Miss.,
 
 296 F.3d 671, 674 (8th Cir.2002). Subaqueous now urges that the trial judge foundered in its instruction on the Pennsylvania Rule, reasoning Corbin failed to offer evidence appellant violated a maritime safety statute or regulation.
 

 Squaring away this issue turns generally on whether evidence at trial could support a finding that Subaqueous violated a statute or regulatory provision involving ma-me safety or navigation.
 
 See id.
 
 As the trial court explained in its instructions to the jury, the Rules of the Road apply to all vessels upon the inland waters of the United States.
 
 See
 
 33 U.S.C. § 2001 (2009) (providing “[t]hese Rules apply to all vessels upon the inland waters of the United States”). The word “vessel” includes “every description of water craft, including nondisplacement craft and seaplanes, used or capable of being used as a means of transportation on water.”
 
 Id.
 
 § 2003(a). Appellant contends that the Rules of the Road could not have applied to it (but could have and should have applied to appellee) because Corbin’s boat collided with a pipeline, as opposed to a “vessel.” The better argument is that the operator of a tug such as the “Contender” cannot absolve itself of responsibility for the wanderings of objects loosed from one of its vessels.
 
 See In re Am. Milling Co.,
 
 270 F.Supp.2d 1068, 1096 (E.D.Mo.2003) (applying Rules of the Road to tow operator where captain’s negligence caused barges to break loose from tow and damage another vessel).
 

 Appellee needed only to show that appellant violated one of the Inland Navigational Rules to warrant an instruction on the Pennsylvania Rule. Inland Navigational Rule 2 states in pertinent part:
 

 
 *1267
 
 Nothing in these Rules shall exonerate any vessel, or the owner ... thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.
 

 33 U.S.C. § 2002 (2009). In practice courts have interpreted this rule to require a general standard of due care.
 
 See, e.g., In re Am. Milling Co., Ltd.,
 
 409 F.3d 1005, 1012 (8th Cir.2005) (faulting captain for failing to properly consider strength of flood-level current existing on the evening of allision with the Eads Bridge, in violation of Rule 2 of the Inland Navigational Rules). Appellee presented competent substantial evidence that Johnson, operating the “Contender” to switch out the “Kenner” for the “Y2K,” allowed a black dredge pipe to float across the main channel off Horseshoe Beach in the process. Here, evidence of a wayward dredge pipe laid across a maritime throughway provided the bulwark for an instruction on Rule of the Road 2. As a result, we find no error in the reciprocal Pennsylvania Rule instruction.
 

 C. Damages
 

 Lastly, we review a trial court’s granting or denial of a motion for new trial for abuse of discretion.
 
 Brown v. Estate of Stuckey,
 
 749 So.2d 490, 494 (Fla.1999). Corbin alleges the trial court abused its discretion by refusing to order a new trial because the damages were against the manifest weight of the evidence. Broadly speaking, the jury’s verdict should be disturbed only when contrary to the manifest weight of the evidence.
 
 See id.,
 
 at 492 (reviewing trial court’s granting of new trial on grounds that verdict was contrary to manifest weight of the evidence). Appellate courts will thus tolerate a list, but must guard against permitting capsize, when it comes to reviewing amount. We address each category of damages in turn.
 

 The amount of an award for loss of future earning capacity should be measured by the plaintiffs diminished ability to earn income in the future, rather than plaintiffs actual loss of future earnings.
 
 See Auto-Owners Ins. Co. v. Tompkins,
 
 651 So.2d 89, 91 (Fla.1995). The Florida Supreme Court has articulated the standard by which future damages are to be awarded, stating that “the appropriate test is to permit the recovery of future economic damages when such damages are established with reasonable certainty.”
 
 Id.
 
 at 90-91.
 

 Subaqueous anchored its argument on this question upon Corbin’s tax return documentation from the four-year period beginning in 2002 and ending in 2005. Corbin’s average annual net income over this time came to just over $11,000, peaking at $14,420 in 2002. Roberts explained that income tax returns do not fully reflect the extent of gross revenue in a cash-based business like fishing. Cor-bin, meanwhile, alluded to unreported sources of income. Roberts, however, also agreed Corbin had reached his maximum earning capacity after 35 years as a commercial crabber. Of still greater significance was the information upon which Roberts relied in reaching his conclusion that appellee’s earning capacity exceeded $25,000 per year. Rather than limiting the inquiry to fishers and flshing-related occupations, Roberts surveyed a broad range of vocations and attendant income statistics from occupational codes compiled by the U.S. Bureau of Labor Statistics. These occupations included managers in the farming and forestry industry, agricultural inspectors, animal breeders, equipment operators, loggers, and forest conservation workers.
 

 
 *1268
 
 Appellee has not been, and was never likely to be, anything other than a fisherman. Our opinion is informed by appel-lee’s lifelong career as a waterman (which he began at age 12) and his testimony, “I never wanted to do anything but work on the water ... I wouldn’t be happy doing anything else.” Fully understanding that Florida law emphasizes the claimant’s capacity to earn, we are not persuaded Roberts established Cor-bin’s loss of future earning capability with sufficient reckoning. Roberts based the earning capacity calculation almost entirely on the aforementioned amalgam of diverse occupations, casting the $25,000 per year estimate adrift from a historical reality spanning the better part of 40 years. Corbin’s hint to additional, yet undisclosed, income appears the only evidence appellee’s earning capacity may have reached this level. Barring any proof that unreported income could have accounted for the nearly $14,000 difference between Roberts’ earning capacity calculation and appellee’s net income as appearing on his tax returns, this evidence, too, cannot be considered to infuse Roberts’ projections with the necessary degree of certainty. We thus find the court abused its discretion in denying appellant’s motion for new trial on this issue.
 

 We next look at future medical expenses. The record must contain evidence from which the jury can determine the amount of medical expenses the plaintiff is reasonably certain to incur in the future.
 
 See Loftin v. Wilson,
 
 67 So.2d 185, 188 (Fla.1953) (holding “only medical expenses which are reasonably certain to be incurred in the future are recoverable”). Here, Dr. Feussner merely surmised that epidural injections or IDD therapy could be appropriate at a later juncture in appellee’s treatment. Though Feussner ventured that surgery could cost as much as $30,000, he would not recommend a surgical approach unless Corbin lost a substantial amount of weight. Dr. Valentine, a pain management specialist, did discuss the possibility of facet joint blocks or rhizotomy, but appellee’s need for such treatments was similarly speculative. Moreover, with the exception of surgery, neither Feussner nor Valentine offered cost estimates for those procedures in the event they became medically advisable. The foregoing evidence does not provide sufficient ballast for anything more than a future need for pain medication.
 

 The cost of the requisite pain medications would amount to just over $7,000 over the course of Corbin’s estimated remaining life, yet the jury awarded appellee $84,600 in future medical expenses. Given the lack of evidentiary support appellee would incur any medical expense beyond the pain medications, the court ventured too far off course in refusing to order a new trial as to future medicals.
 

 Juries have wide latitude in determining an award of noneconomic damages in tort cases.
 
 See Bould v. Touchette,
 
 349 So.2d 1181, 1184 (Fla.1977) (holding “verdict which has been approved by the trial court ... should not be disturbed on appeal ... in the absence of a showing that it imposes a hardship out of proportion to the injury suffered”). The party claiming an excessive verdict bears the burden to prove that the amount is not supported by the evidence or that the jury was influenced by matters beyond the bounds of the record.
 
 See Fla. Power & Light Co. v. Robinson,
 
 68 So.2d 406, 415 (Fla.1953) (stating “burden is with him who assails the amount of the verdict to show that it is wholly unsupported by the evidence, or that the jury was influenced by passion [or], prejudice”).
 

 
 *1269
 
 Appellee provided substantial testimony on the nature and extent of his pain and suffering. A fisherman by career and avocation, appellee can no longer go out on the water due to his disc herniation, and he is expected to endure chronic pain. He suffers from injury-related depression, the result of serious limitations in his daily life, i.e., an inability to sleep at night, play with his grandchildren, and be generally independent. Counsel for appellee suggested a value of $5.00 per hour as compensation for appellee’s past and future pain and suffering. Extrapolated over a life expectancy of 22.8 years, this would amount to $1,231,000. A noneconomic damages award cannot be sustained if it is inordinately large, shocks the judicial conscience as having no reasonable evidentia-ry basis, or has been unduly influenced by passion or prejudice.
 
 Rety v. Green,
 
 546 So.2d 410, 420 (Fla. 3d DCA 1989). Though the award for noneconomic damages ($1,438,000) was titanic by appellant’s measure, we have no basis to rule it was so inordinately large as to lack a reasonable relation to the damages proven. Given the extent to which the effects of appellee’s accident have permeated the various aspects of his everyday life, we cannot find the court strayed from the wide berth allowed by law in denying appellant’s motion for new trial on the issue of noneco-nomic damages.
 

 AFFIRMED in part, REVERSED in part, and REMANDED.
 

 THOMAS, J., and MORRIS, STAN R., Associate Judge, concur.
 

 *
 

 As conveyed by the court, those rules read:
 

 Rule 2, Responsibility. Nothing in these rules shall exonerate any vessel or the owner, master or crew thereof from the consequences of any neglect of any precaution which may be required by the ordinary practice of seamen or the special circumstances of the case. Rule 5, Lookout. Every vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in prevailing circumstances and conditions so as to make a full appraisal of the situation in the risk of collisions.
 

 Rule 6, Safe Speed. Every vessel shall at all times proceed at a safe speed so that she can
 
 *1265
 
 take proper and effective action to avoid collision and be stopped within the distance appropriate for prevailing circumstances.
 

 Rule 7, Risk of Collision. Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if a risk of collision exists. If there is any doubt, such risk shall be deemed to exist.