# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 5D2024-0452
LT Case No. 2011-30599-CICI

_____

CHERYL ANNE HEY AHMED, As
Personal Representative of the
Estate of W. Robert Hey

    Appellant,

    v.

MID FLORIDA DEVELOPMENT,
LLC, SHERIFF GUINDI, E.
JOSEPH LECOMPTE, JR., EDWARD
STAUDT, and MICHELLE HEY
THOMAS

    Appellees.

_____


On appeal from the Circuit Court for Volusia County.
Dennis Craig, Judge.

John S. Norton, Jr., of John S. Norton, Jr., P.A., Daytona Beach,
for Appellant.

Christopher V. Carlyle, of The Carlyle Appellate Law Firm,
Orlando, for Appellees, Mid Florida Development, LLC, Sheriff
Guindi, E. Joseph LeCompte, Jr., and Edward Staudt.

No Appearance for Remaining Appellee.

May 16, 2025

BOATWRIGHT, J.

Cheryl Ann Ahmed (Ahmed), as personal representative of the Estate of W. Robert Hey, timely appeals the final summary judgment entered in favor of Mid Florida Development, LLC, Sheriff Guindi, E. Joseph Lecompte, Jr., and Edward Staudt (collectively, "Appellees"). Ahmed contends that summary judgment was improperly entered because disputed issues of material fact remain. We agree and find that because there are remaining questions of material fact, the trial court erred in entering summary judgment, and we therefore reverse.

I.

In June 2003, Robert Hey ("Hey") entered into an agreement (the "June Agreement") with Mid Florida Development, LLC ("MFD")[1], wherein MFD agreed to pay Hey a total of $950,000.00 to purchase property in Volusia County (the "Eastgate Property") so that MFD could develop the land and build condominiums or townhouses. Pursuant to the June Agreement, in addition to the purchase price for the Eastgate Property, Hey was to receive 20 percent of any net proceeds from the sale of the townhouses or condominiums. Paragraph 11.12(b) of the June Agreement specifically provides as follows:

> [A]fter deduction and payment for any and all charges as set forth in paragraph 11.12(a), the parties agree that any net proceeds from the sale of the condominium and/or townhouse residential units shall be divided on an 80/20 basis, with eighty percent credited to [MFD], and twenty percent credited to [Hey]. It is understood and agreed that [MFD] shall be reimbursed for any and all expenses as allowed pursuant to paragraph 11.12(a) prior to the division of any net proceeds herein between [MFD] and [Hey].

---

[1] MFD is a Florida limited liability company which is taxed as a partnership for federal income tax purposes.

Hey and MFD entered into a supplemental agreement in August 2003 (the "August Agreement"), which incorporated the June Agreement and clarified the terms of the June Agreement. Paragraph 4 of the August Agreement states, in relevant part, that:

> [MFD] shall establish and shall maintain as part of its financial information an earnings account for the Project with appropriate allocation of estimated earnings for [Hey] and [MFD]. Such earning accounts shall allocate earning [MFD] and [Hey] at a level that is not less than **taxable earnings for federal income tax purposes**. Parties agree that [MFD] shall be entitled to eighty (80) percent of **net income** and [Hey] shall be entitled to twenty (20) percent of **net income** from the entire Project from all sources. Once sales of the units, whether townhouses, condominium units or other residential units, and any other facilities commences, so that income is derived from the Project, then **[MFD] shall make distributions to [Hey] at least annually within sixty (60) days of the end of the Project's fiscal year in an amount of at least sixty (60) percent of [Hey's] share of the net profits for that proceeding [sic] year.** At the conclusion of the fiscal year in which at least ninety (90) percent [of] the units have been sold [MFD] shall render its preliminary final accounting, and when all units held for sale have been sold, then its final accounting shall be rendered, and [MFD] shall distribute to [Hey] the entire balance of the **net income** due [Hey] pursuant to this Agreement.

(emphasis added). According to the August Agreement, Hey was now entitled to a percentage of net income from the sale of the townhouses on an annual basis and at the end of the project. Pursuant to the agreements, MFD completed construction of townhouses on the Eastgate Property and began selling them in September 2006. The project concluded in 2008. Hey died in March 2010. Thereafter, in March 2011, Ahmed, as personal representative of Hey's estate, filed suit against MFD for: (1) breach of contract; (2) request for accounting; and (3) constructive trust. Specifically, she alleged that MFD had sold townhouses in

3

the Eastgate Property and had made a considerable profit, but it failed to pay Hey a percentage of profits to which he was entitled under the agreements.

Thereafter, in 2020, MFD filed its first motion for summary judgment, arguing that it did not breach the June and August agreements because no profit was ever derived from the sale of the townhouses in the Eastgate Property. The trial court granted MFD's motion. The court's final order was timely and successfully appealed by Ahmed, and our Court reversed. This Court held that summary judgment was improper because MFD's expert's affidavit was insufficient to identify whether MFD had "net proceeds" during the relevant timeframe; and therefore, MFD failed to meet their burden of showing that no genuine issue of material fact existed. *Ahmed v. Mid Fla. Dev., LLC,* 347 So. 3d 455, 457-58 (Fla. 5th DCA 2022).

Upon remand, MFD filed a second motion for summary judgment. In its second motion, MFD again argued that it did not breach the agreement because it never derived any profit from the sale of the townhouses related to the Eastgate Property. MFD further alleged that it actually suffered losses in excess of $900,000.00, as evidenced by its federal income tax returns. It further noted that it was no longer in business as it had ceased business operations at the end of 2008.

As support for its argument that it did not breach the June and August agreements, MFD relied on its federal tax returns for the years it was in business to show that it had no profits. In particular, MFD pointed to its 2006 federal tax return, which showed no taxable income attributable to the Eastgate Property in 2006. As part of its tax return, MFD reported gross sales on line one of its Form 1065 in the amount $3,736,297.00, and on line two, costs in the amount of $3,488,183.00. The tax return also indicated deductions totaling $202,786.00 and a section 179 depreciation deduction in the amount of $36,709.00. *See* I.R.C. § 179. This led to a total of zero net taxable income for the year. The tax return also indicated there was an additional $9,262,016.00 long term capital gain for the year.

4

MFD filed an affidavit in support of its motion for summary judgment from Brandon Perry ("Perry"), a certified public accountant. Perry attested that he provided accounting services for MFD from 2003 through 2008. He explained that MFD was only actively engaged in business related to the Eastgate Property and, therefore, the income or losses shown on the tax returns all related to the Eastgate Property. Perry also attested that the Eastgate Property never showed any taxable earnings for federal income tax purposes at the end of the fiscal years between 2003 and 2008 and thus, had no net proceeds. Accordingly, the members in MFD never received a distribution of taxable income related to the Eastgate Property. Perry finally alleged that the MFD members had a loss over the life of the project, which was evidenced by the fact that the members collectively had to make a total of $879,539.00 in cash contributions to MFD to support the Eastgate Property's business activities. He attached to the affidavit copies of MFD's federal tax returns from 2003 through 2008. In addition, Perry noted that there were long-term capital gains depicted on the 2004 and 2006 tax returns but they were not related to the Eastgate Property. Instead, the long term capital gains were attributable to the sale of unrelated parcels of real property in which MFD had passively invested.

During the course of the proceedings, in response to the motions for summary judgment, Ahmed filed an affidavit wherein she alleged that MFD sold twenty-six townhouses in 2006 for a total of $7,204,000.00. She attached certified copies of the deeds of sale from the Volusia County public records showing the 2006 sale of these townhouses, with the total sale amount equaling the amount she alleged in her affidavit. She argued that, based on these sales and the 2006 tax return, $3,467,703.00 in income was not reported on the tax return, and this represented net income from which MFD owed Hey a percentage under the June and August agreements. Therefore, Ahmed contended that there were questions of fact and summary judgment was improper.

In addition, Ahmed also filed two affidavits from a certified public accountant, John Shelley ("Shelley"). Shelley referred to the public records of Volusia County showing that MFD sold twenty-six townhouses in the Eastgate Property during 2006 and received total income from those sales in 2006 in the amount of

$7,204,000.00. He attested that $3,467,703.00 was not reported in gross sales on the 2006 tax return. Although this amount should have been included in the amount of gross sales on the tax return, he opined that this missing amount could have been included in the amount of long-term capital gains, as this was a common practice by real estate developers to allocate the gain from sales between ordinary income and capital gains when selling developed property.

Shelley's second affidavit contained a spreadsheet regarding the sales and costs of the townhouses over the entire course of the project. Shelley averred this spreadsheet was provided by MFD. The spreadsheet indicates that at the end of 2008, after all sales and costs were calculated for the entire project, MFD had $2,596,526.00 cash available to it. Shelley opined that these amounts represented substantial profits that were enjoyed by MFD over the life of the project.

At the hearing on the second summary judgment motion, MFD relied on its tax returns to show that they had no net income and thus, no net proceeds over the course of their business. Ahmed raised the discrepancy in the sales revealed by the public records versus the gross sales reported on the 2006 tax return. MFD did not seem to dispute the sales were in the amount claimed, but stated that due to costs, such as closing costs and loan repayments, the amount it received from the sales was $3,736,297.00. However, MFD provided no documentation to prove this other than its tax returns and the general assertion from Perry's affidavit that MFD had no taxable earnings and thus, no net proceeds. MFD also did not specifically explain or offer documentation concerning the $9,262,016.00 in long-term capital gains reported on the 2006 return, which was alleged to be associated with "unrelated property."

Rather than denying the summary judgment motion, the trial court provided that it was Ahmed's burden to show that the alleged costs did not offset the total sale amounts from the public records. The trial court then found that based on the assertions of Perry's affidavit that there were no net proceeds and MFD did not derive any profit from this business venture but rather suffered losses; and accordingly granted summary judgment.

6

II.

A.

Initially, we note that there was some confusion at the trial level on the interpretation of the June and August agreements on two key points particular to this appeal. We review the trial court's interpretation of the contract de novo. *Smith v. Carlton*, 348 So. 3d 52, 56 (Fla. 5th DCA 2022) (the "[i]nterpretation of a contract is a question of law, and an appellate court may reach a construction contrary to that of the trial court").

First, during the course of the proceedings, there seemed to be some confusion as to the meaning of the term "net proceeds" regarding whether Hey was entitled to any payments from MFD. The June Agreement stated that "any net proceeds from the sale of the condominium and/or townhouse residential units shall be divided on an 80/20 basis, with eighty percent credited to [MFD], and twenty percent credited to [Hey]." Although the June Agreement did not define "net proceeds," the term "net proceeds" is used synonymously with the term "net profits" in the August Agreement. "Net proceeds" and "net profits" are also used synonymously with "net income," as the August agreement states that the "Parties agree that [MFD] shall be entitled to eighty (80) percent of net income and [Hey] shall be entitled to twenty (20) percent of net income from the entire Project from all sources." "Net income," as used in the August Agreement, is tied to taxable earnings, and thus would be considered net taxable income, as the August Agreement provides that "such earning accounts shall allocate earning [MFD] and [Hey] at a level that is not less than taxable earnings for federal income tax purposes." Thus, based on the June and August agreements, if MFD had any net taxable income from the sale of townhouses during a particular fiscal year or at the end of the project, Hey was entitled to a percentage of the net income, i.e., "net profits" or "net proceeds."

The parties appeared to agree at the hearing on the second summary judgment motion, that the term "net proceeds," as used in the June Agreement was synonymous with the term net income as used in the August Agreement, as the sole focus of the hearing

7

was on the tax returns from the years MFD was in business and whether it had taxable income. Although, this Court in the first appeal utilized the term "net proceeds," we find the term net proceeds, as used in the June Agreement, was clarified in the August Agreement and all these terms appear to be used to identify the same thing: net income. Thus, our analysis will focus on whether a factual dispute exists as to whether MFD had any net income, i.e., net taxable income during the years it was in existence.[2]

Second, the trial court found that the agreements required that a percentage of the net income only be paid if there was net income over the life of MFD's business venture. The trial court is partially correct, as the August Agreement states, **"Parties agree that [MFD] shall be entitled to eighty (80) percent of net income and [Hey] shall be entitled to twenty (20) percent of net income from the entire Project from all sources."** However, as Ahmed points out, the agreement also states:

> "Once sales of the units . . . commences, so that income is derived from the Project, then [MFD] **shall make distributions to [Hey] at least annually within sixty (60) days of the end of the Project's fiscal year in an amount of at least sixty (60) percent of [Hey's] share of the net [income] for that proceeding [sic] year.**

(emphasis added). Thus, according to the August Agreement, if MFD had net income in a given year, then Hey was entitled to a percentage of the net income on an annual basis and not only when the entire project was completed.

---

[2] Although the two agreements were incorporated, the interpretation on this issue is consistent with the August Agreement, which states, "[T]his Agreement contains the entire understanding of the parties hereto with respect to the subject matter hereof, and no prior or other written or oral agreement or undertaking pertaining to any such matter shall be effective for any purpose."

B.

With these points in mind, we find that the trial court erred in granting summary judgment. First, the trial court erred when it found that only the entire life of the project was germane to whether Hey was entitled to a percentage of the net income. Although part of the August Agreement allowed the trial court to analyze the net income from the entire project, the August Agreement also required the trial court to analyze whether Hey was entitled to a percentage of net income generated by MFD related to the Eastgate Property on an annual basis. This, the trial court did not consider. In addition, there still exists a dispute of material fact as to whether there was net income over the life of the entire project or during the 2006 taxable year.

"A trial court's ruling on a motion for summary judgment is subject to a de novo standard of review." *Olsen v. First Team Ford, Ltd.,* 359 So. 3d 873, 876 (Fla. 5th DCA 2023) (citing *Baxter v. Northrup*, 128 So. 3d 908, 910 (Fla. 5th DCA 2013)). "To prevail on a motion for summary judgment, a movant must show that (1) 'there is no genuine dispute as to any material fact' and (2) 'the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fla. R. Civ. P. 1.510(a)); *Williams v. Weaver,* 381 So. 3d 1260, 1264 (Fla. 5th DCA 2024) (quoting *Welch v. CHLN, Inc.*, 357 So. 3d 1277, 1278 (Fla. 5th DCA 2023)).

"In amending Florida Rule of Civil Procedure 1.510, the Florida Supreme Court sought to align Florida's summary judgment rule with the federal summary judgment standard." *Olsen,* 359 So. 3d at 877 (citing *In re: Amends. to Fla. R. Civ. P. 1.510,* 317 So. 3d 72, 74 (Fla. 2021)). "According to the Florida Supreme Court, 'those applying new rule 1.510 must recognize the fundamental similarity between the summary judgment standard and the directed verdict standard.'" *Id.* (quoting *In re: Amends. to Fla. R. Civ. P. 1.510,* 317 So. 3d at 75). "Both standards focus on 'whether the evidence presents a sufficient disagreement to require submission to a jury.'" *Id.* "And under both standards, '[t]he substantive evidentiary burden of proof that the respective parties must meet at trial is the only touchstone that accurately measures whether a genuine issue of material fact exists to be tried.'" *Id.* (citations omitted). "Those applying the new rule

9

1.510 must recognize that the correct test for the existence of a genuine factual dispute is whether 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "Thus, in Florida it will no longer be plausible to maintain that 'the existence of any competent evidence creating an issue of fact, however credible or incredible, substantial or trivial, stops the inquiry and precludes summary judgment, so long as the 'slightest doubt' is raised.'" *Id.* (citation omitted).

"One of the principal purposes of the summary judgment rule is to 'isolate and dispose of factually unsupported claims or defenses.'" *Id.* (quoting *In re: Amends. to Fla. R. of Civ. P. 1.510,* 309 So. 3d 192, 194 (Fla. 2020)). "However, the Florida Supreme Court, in adopting this amendment, reaffirmed 'the bedrock principle that summary judgment is not a substitute for the trial of disputed fact issues.'" *Id.* "As the United States Supreme Court itself has emphasized, the summary judgment rule must be implemented 'with due regard . . . for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury.'" *Id.*

As referenced above, "[p]roperly understood, summary judgment is akin to a pre-trial directed verdict." *Ortega v. JW Marriott Inv., LLC,* 50 Fla. L. Weekly D511, D512 (Fla. 3d DCA Feb. 26, 2025) (quoting *CG Tides LLC v. SHEDDF3 VNB, LLC,* 388 So. 3d 1081, 1084 (Fla. 3d DCA 2024)). "Summary judgment is not designed to resolve disputed issues of fact. It merely serves to identify whether an issue of fact exists that must be resolved by trial." *Id.* (quoting *CG Tides LLC,* 388 So. 3d at 1084-85). "The evidence in the summary judgment record is interpreted in the light most favorable to the non-moving party." *Id.* (quoting *CG Tides LLC,* 388 So. 3d at 1085). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson,* 477 U.S. at 255. "If there are conflicts in the evidence or if different reasonable inferences could be drawn from the evidence, then the issue is a factual one that should be submitted to the jury and not be decided by the trial court as a matter of law." *Dolgen Corp, LLC v. Doty,* 383 So. 3d 864, 866 (Fla.

5th DCA 2023) (quoting *Etheredge v. Walt Disney World Co.,* 999 So. 2d 669, 671 (Fla. 5th DCA 2008)).

Building upon these principles, a movant for summary judgment has the initial burden of demonstrating the nonexistence of any genuine issue of material fact. *Landers v. Milton,* 370 So. 2d 368, 370 (Fla. 1979). It is not enough for the moving party to merely provide affidavits that state conclusions of facts or law to meet its burden. *Heitmeyer v. Sasser*, 664 So. 2d 358, 360 (Fla. 4th DCA 1995); *see also Seinfeld v. Com. Bank & Tr. Co.,* 405 So. 2d 1039 (Fla. 3d DCA 1981) (providing that general statements in an affidavit in support of a motion for summary judgment, which are framed in terms only of conclusions of law, do not satisfy a movant's burden of proving the nonexistence of a genuine material fact issue); *Hurricane Boats, Inc. v. Certified Indus. Fabricators, Inc.,* 246 So. 2d 174, 175 (Fla. 3d DCA 1971) (affidavit in support of summary judgment may not be based on factual conclusions or conclusions of law). But once the movant tenders competent evidence to support the motion, the opposing party must come forward with counterevidence sufficient to reveal a genuine issue. *Landers,* 370 So. 2d at 370.

Finally, "[s]ummary judgment 'by no means authorizes trial on affidavits.'" *CG Tides LLC,* 388 So. 3d at 1085 (quoting *Anderson,* 477 U.S. at 255). When the trial court determines the summary judgment record contains conflicting evidence on a material issue of fact from which a factfinder could reach different conclusions by crediting some evidence over other evidence, the court does not resolve the factual dispute. *Id.* It simply denies summary judgment and allows the case to proceed to trial. *Id.*

Here, the trial court did precisely what *CG Tides LLC* above cautions against—allowed trial by affidavits and weighed the credibility of Perry's opinion over that of Shelley's. In agreeing with Perry's affidavit, the trial court appeared to be misled by MFD's argument that it did not have any net income from the project. Specifically, the dispute between the parties centered on the 2006 tax year in which MFD showed no net income on its tax returns. The tax return reported gross sales in the amount of $3,736,297.00 on line one and costs in the amount of $3,488,183.00 on line two of MFD's Form 1065. The tax return also indicated

11

deductions in the amount of $202,786.00 and a section 179 depreciation deduction in the amount of $36,709.00. This led to a total of zero net income for the year.

However, Ahmed produced deeds of sale showing that during the 2006 taxable year, MFD sold twenty-six townhouses totaling $7,204,000.00. Shelley stated $7,204,000.00 should have been reported as the amount of gross sales, rather than $3,736,297.00. As such, MFD, as a cash method taxpayer, was required to list its gross sales on line one of its Form 1065, which arguably were $7,204,000.00. *See* 2006 IRS Instructions for Form 1065 at 15 (gross receipts or sales from all trade or business operations are to be entered on line one). MFD's trial counsel argued that the amount of $3,736,297.00 listed on line one of the tax return for gross sales was after costs were excluded: specifically, closing costs and loan repayments.[3] However, as argued by Ahmed, any costs should have been included in the costs of $3,488.183.00 on line two of the tax return or on preceding lines providing for certain deductions and repayment of a loan would not be excludable from gross income or sales. *Id.*

Most importantly, there is no record evidence to corroborate any of these alleged costs other than what was entered on the tax

---

[3] We note that this is where the trial court may have been misled as loan proceeds are typically not included in gross income. Borris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Gifts, and Estates*, ch. 7-2 (3d ed. 1999). Likewise, the repayment of those loans would not be excluded from gross income, or in this case, gross sales. *Id.* A loan may be obtained to purchase goods, but the purchase price would be used to calculate the costs of goods sold. *Alvarado v. C.I.R.,* T.C. Memo 2024-1, 8 (2024); *Estate of Ronning v. C.I.R.,* T.C. Memo 2019-38 (2019). However, the repayment of a loan is not considered in the cost of goods sold. *See Hendrickson v. C.I.R.,* T.C. Memo 1983-560 (1983). But the interest paid on business loans could be proper as a deduction. I.R.C. § 163(a). In addition, the closing costs could be used to calculate the costs of goods sold. Publication 551 Basis of Assets, IRS Pub. 551 (I.R.S.), 2002 WL 32000819 (2002). However, these costs and deductions should not be excluded from the gross sale amount.

returns. This was conceded by MFD's counsel during the summary judgment hearing on the second motion.[4] As such, MFD has not produced any summary judgment evidence to substantiate the claim of these alleged costs. Simply put, MFD has yet to account for the missing $3,467,703.00 from the 2006 sales of the twenty-six townhouses. This raises a material fact in dispute. However, rather than hold MFD to its burden, the trial court impermissibly shifted the burden to Ahmed, stating it was her burden to show that there was net income and in particular to show that that MFD did not incur these alleged costs. Based on the record evidence, it appears that the 2006 tax return may have grossly understated MFD's income, which would put the matter of whether there was net income squarely in the province of the finder of fact at trial.

In addition, as referenced above, we note that on the 2006 tax return MFD reported an amount of $9,262,016.00 attributed to long term capital gain. Perry's affidavit alleges that this amount was attributable to the sale of other property held by MFD as passive income and was not related to the Eastgate Property, and as such it would not have been included as gross sales on the 2006 tax return. As conceded at the second summary judgment hearing, MFD was in the business of selling townhouses and thus, the Eastgate Property was held primarily for sale to customers in the ordinary course of business. *See U.S. v. Winthrop*, 417 F.2d 905, 910-11 (5th Cir. 1969) (taxpayer who began subdividing and selling lots with orderly sales being made by him over period of years held land primarily for sale to customers in ordinary course of business and was not entitled to capital gains treatment of net income from such sales). Thus, any net income attributable to the sales of the Eastgate Property would be taxed as ordinary income

---

[4] MFD's counsel conceded at the second summary judgment hearing that the only evidence of the costs and proceeds from the sale of the townhouses were listed on the tax returns. He alleged that many documents were missing due to the death of some of the members. Shelley attached a spreadsheet to his second affidavit, which he attested was provided by MFD, and which showed the sales and cost of the entire project. However, the spreadsheet did not specifically detail those costs, and MFD's counsel stated they were not available.

rather than long term capital gain. *Id.*; s*ee* I.R.C. § 1221(a)(1) (capital asset is not property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business). As a result, absent a tax code section to the contrary, we acknowledge that the gross sales from the twenty-six townhouses in 2006, i.e., $7,204,000.00, would normally not be included in long term capital gain.

However, we recognize that tax returns do not always accurately state all income. *Subaqueous Servs., Inc. v. Corbin*, 25 So. 3d 1260, 1267 (Fla. 1st DCA 2010) (income tax returns may not fully reveal extent of earnings). Shelley alleged in his first affidavit that the missing $3,467,703.00 could have been included as part of the $9,262,016.00 in long term capital gains listed on the 2006 tax return. He opined that this was a common practice of real estate developers to bifurcate proceeds from the sale of properties between ordinary income and capital gain to maximize tax rates. As Perry never provided information about this alleged capital asset and there is no other record evidence that exists from this sale, we find that Shelley's assertions also raise a factual dispute as to whether part of this alleged long-term capital gains figure included the missing $3,467,703.00.

Finally, MFD claims that it had no net income over the entire scope of the project, which concluded in 2008. Notwithstanding the missing $3,467,703.00 as previously discussed, Shelley's second affidavit contained a spreadsheet regarding the sales and costs of the townhouses over the entire course of the project. Shelley averred this spreadsheet was provided by MFD. The spreadsheet indicates that at the end of 2008, after all sales and costs were calculated for the entire project, MFD had $2,596,526.00 cash available to it. Shelley opined that these amounts represented substantial profits that were enjoyed by MFD over the life of the project. Although Perry's affidavit makes general assertions that there was no net income over the life of the project, MFD has done nothing to show that this $2,596,526.00 was not net income. Therefore, we find that MFD has not sufficiently shown that there is not a material fact in dispute over the net income from the entire project.

III.

14

For the aforementioned reasons, we find the trial court erred in granting MFD's second motion for summary judgment. "In reviewing the trial court's order, we consider the record evidence in the light most favorable to the non-movant, drawing all reasonable inferences in support of the conclusion that [Appellant] has raised a jury issue . . . ." *Kimbrel v. Clark,* 385 So. 3d 1124, 1127 (Fla 1st DCA 2024) (citing *Blue v. Weinert,* 284 So. 3d 1176, 1177 (Fla. 1st DCA 2019)). The party moving for summary judgment must conclusively show the absence of a genuine issue of material fact, and the court must draw every possible inference in favor of the party against whom a summary judgment is sought. *Id.* Here, MFD failed to account for the missing $3,467,703.00 based on the 2006 sales or show how the $2,596,526.00 was not net income over the course of the project. It was MFD's burden to show there was no material fact in dispute, and it has failed to do so. In fact, the only significant difference between MFD's current motion for summary judgment evidence and the evidence supporting the previous one is that Perry stated in his affidavit there were no taxable earnings, i.e. no net proceeds, over the life of the project. This conclusory statement does not account for the missing proceeds or alleged costs which would allow MFD to meet its burden on summary judgment. *See Heitmeyer*, 664 So. 2d at 360. This was the concern from this Court's previous decision. We still conclude that MFD has failed to show that there was no net income attributable to the sales related to the Eastgate Property and thus, still has not met its burden.

REVERSED and REMANDED.

EDWARDS, C.J., and PRATT, J., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

15